## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **LEVI SPRINGER,** | ) | |
| Plaintiff | ) | Civil Action No.: 7:12cv00158 |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| **C/O BROWN #1, et al.,** | ) | By: PAMELA MEADE SARGENT |
| Defendants. | ) | United States Magistrate Judge |

The pro se plaintiff, Levi Springer, is an inmate at Red Onion State Prison, ("ROSP"). This case is before the court on the Motion For Summary Judgment of the defendants R. Brown, W. Brown, Randal Mathena, A. Kilbourne, Sgt. Middleton and Sgt. McQueen (Docket Item No. 42). None of the parties have requested a hearing. The motion is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The undersigned now submits the following report and recommended disposition.

### I. Facts & Procedural History

Springer brings this civil rights action against several correctional officers, prison workers and ROSP Warden Randal Mathena. Springer seeks relief under 42 U.S.C. § 1983 for interference with his ability to exhaust his administrative remedies, cruel and unusual punishment and a violation of his due process rights.[1] Defendants Bullion, Nelson, Phipps and Whitt, ("the Healthcare Defendants"),

---

[1] Springer's claims are contained in his Complaint, (Docket Item No. 1), and in a motion to amend, which the court has denied. (Docket Item Nos. 28, 39.) Therefore, I will address only the allegations contained in the Complaint. Springer does not specify the relief sought in his Complaint.

filed a previous Motion For Summary Judgment For Failure To Exhaust Administrative Remedies. (Docket Item No. 33). By Order entered March 7, 2013, the court has granted this motion and dismissed the claims against these defendants. (Docket Item No. 89.)

Springer's claims all arise from injuries he claims he suffered on December 6, 2011, when correctional officers slammed the security box on his cell on his arms. In his sworn Complaint, (Docket Item No. 1) ("Complaint"), Springer alleges that on December 6, 2011, Correctional Officers R. Brown, W. Brown[2] and Hylton[3] came to his cell to take him for a medical appointment with the institutional physician, Dr. McBride. (Complaint at 3-4.) He alleges that he "stripped naked" as required, and placed his clothes into the security box. (Complaint at 4.) However, when he realized that he had not placed his shoes into the security box, he went to the back of his cell to retrieve them, making R. Brown "extremely upset" because he was taking additional time. (Complaint at 4.) Springer alleges that when he placed his shoes into the security box, R. Brown "slammed closed the security box on both of [his] arms." (Complaint at 4.) He states that R. Brown and W. Brown began laughing, and W. Brown began helping R. Brown apply more pressure, pushing the box upward until a combination of the security box, the tray slot and the upper rim of the steel door cut into his arms. (Complaint at 4.) Springer alleges that he struggled to pull his arms free, which resulted in deeper cuts and scratches to his arms. (Complaint at 4.) He states that Hylton became confused at what to do, but observed the situation. (Complaint at 4.) Springer alleges that when he was able to remove his arms from the box, they

---

[2] Springer's Complaint names C/O Brown #1 and C/O Brown #2 as defendants. These defendants have now been identified as R. Brown and W. Brown, respectively.

[3] Correctional Officer Hylton is now deceased.

were completely numb and he, therefore, did not realize that both arms were bleeding heavily until blood began running out of the box, down the door and onto the floor. (Complaint at 4.) He states that he attempted to grab his underwear out of the security box as he was pulling his arms out because he was naked. (Complaint at 4-5.) However, Springer alleges that when W. Brown saw him do this, he motioned for R. Brown to close the tray slot on his underwear. (Complaint at 5.) Springer states that he was too weak to pull his underwear through the closed tray slot, and Correctional Officer Brown[4] grabbed them, ripping half of them through the tray slot. (Complaint at 5.) Springer alleges that he then requested Hylton call for the doctor who was in the pod office, but that Hylton appeared "confused and scared." (Complaint at 5.) Springer states that R. Brown interrupted him, stating "its time to go, this is what little bitches get" and that all three officers left the pod. (Complaint at 5.)

Springer alleges in his Complaint that he pressed the emergency button and notified Correctional Officer King that he was bleeding heavily from wounds to both arms. (Complaint at 3.) King stated that she would contact a staff member to come assess the situation. (Complaint at 6.) However, after five to seven minutes passed, Springer saw a counselor and a treatment supervisor enter the pod, so he asked them for help. (Complaint at 6.) He alleges that although they both saw the amount of blood loss and that he was naked, "they immediately looked the other way and stated they would send someone to [his] cell." (Complaint at 6.) Springer states that Housing Unit Manager Kilbourne came to his cell to determine what happened. (Complaint at 6.) When Springer insisted he needed to see a doctor or nurse and did not have time to explain what happened, Kilbourne continued to ask what had happened. (Complaint at 6.) Springer again insisted he needed

---

[4] Springer does not specify whether he is referring to R. Brown or W. Brown.

emergency medical treatment due to blood loss, but Kilbourne asked him where his clothes were. (Complaint at 6.) Springer states that, at that time, he covered the window to his cell with paper, which prompted Kilbourne to state "you have now just given me the authority to have my staff suit up with body armor and come in and fuck you up." (Complaint at 6.) Springer states that Kilbourne then left the pod. (Complaint at 6.)

Springer further alleges in his Complaint that Sergeant J. Middleton came to his cell and saw that he was naked and covered in blood. (Complaint at 3.) Springer states that he requested emergency medical treatment while he was applying pressure to the deepest wound on his right arm. (Complaint at 7.) He alleges that Middleton advised him that if he wanted help, he first had to clean himself up and get dressed. (Complaint at 7.) Middleton advised him to take a towel or sheet from his bed and wipe the blood from his arms, then cover the wounds with the sheets. (Complaint at 7.) Correctional Officer Stanley arrived with a video camera and began recording him and the cell. (Complaint at 7.) Springer states that Middleton came with a laundry bag and gave him some boxers, pants and a shirt to wear. (Complaint at 7.) He alleges that he was taken out of his cell, at which time he thought he would see the doctor in the pod office. (Complaint at 7.) However, R. Brown and W. Brown were in the office speaking with the doctor and nurse, so Middleton sent Nurse Deel from the office to "quick wrap" his arms. (Complaint at 7.) Springer alleges that his legs began feeling shaky, and Middleton allowed him to sit at a table. (Complaint at 7.) He states that he was thereafter taken to the medical unit by wheelchair. (Complaint at 7-8.)

Springer's Complaint alleges that, once in the medical unit, Nurse Yates informed him he needed to be transferred to the hospital for stitches as soon as she

saw his wounds.  (Complaint at 8.)  She then phoned the doctor who was in Springer's pod to evaluate him.  (Complaint at 8.)  When asked by a Qualified Mental Health Professional, ("QMHP"), Springer denied that he had tried to cut himself, stating that he was assaulted by two correctional officers.  (Complaint at 8.)  Springer states that Dr. McBride determined that he needed to be transported to the emergency room at the local hospital, and he began completing paperwork for such transport.  (Complaint at 9.)  He again denied that he tried to cut or kill himself when asked by another QMHP.  (Complaint at 9.)  Springer alleges that Dr. McBride exited the room with Warden Mathena, and when Dr. McBride returned, he informed Springer that Mathena would not allow him to be transported to the hospital due to budget cuts.  (Complaint at 10.)  Dr. McBride informed Springer not to worry, as he would render the necessary treatment himself.  (Complaint at 10.) Springer alleges that Dr. McBride estimated that he would need seven to eight stitches to close one wound, three to five stitches to close another wound and dermal bond medical glue to close four other wounds.  (Complaint at 10.)  However, after taking a phone call requesting that Dr. McBride report to the Administration Office, Dr. McBride left the room.  (Complaint at 11.)  Upon his return, Dr. McBride had decided not to use stitches on the second wound.  (Complaint at 10-11.)  Although he closed this wound with dermal bond, Springer alleges that Dr. McBride was not convinced it would remain closed.  (Complaint at 11.)  Springer contends that after consulting with Nurse Yates, Dr. McBride agreed that he should remain in the medical infirmary overnight.  (Complaint at 11.)  At that time, Middleton radioed Sergeant Adams to take over his post with Springer, and when Adams arrived, Middleton went to Warden Mathena's office.  (Complaint at 11.)  Soon after that time, Dr. McBride again was called back to Warden Mathena's office, and when he returned, he had decided Springer did not

need to remain in the medical infirmary, but could be monitored in his housing unit. (Complaint at 11.)

Springer's Complaint also alleges that on December 15, 2011, he requested an investigation of the alleged assault through institutional investigator Bentley, but received no response. (Complaint at 18.) On December 28, 2011, he again requested an investigation, and Sergeant McQueen responded that he would investigate, but never did so. (Complaint at 18.) Springer alleges that McQueen's only response was to an Informal Complaint filed against R. Brown, in which McQueen stated "injuries sustained were the cause of [Springer's] own actions … not the cause of staff actions." (Complaint at 18.) However, Springer alleges that there is no evidence, incident reports or medical reports to substantiate this finding. (Complaint at 18.) He argues that if the QMHPs actually believed he harmed himself, he would have been placed in a suicide suit in a mental health cell under suicide precautions. (Complaint at 18.) Furthermore, he alleges that after release from such suicide watch, he would have been charged with a DOC offense for self-mutilation. (Complaint at 18.) Additionally, Springer alleges that, despite being placed into a different cell upon his release from the medical unit, so that his previous cell could be searched for anything he might have used to injure himself, nothing was found, and he was never charged with any infraction. (Complaint at 19.)

The defendants have offered evidence through affidavits and exhibits in support of their Motion for Summary Judgment. By affidavit dated July 13, 2012, R. Brown stated that on December 6, 2011, he and Officer Hylton went to Springer's cell to take him to see the institutional doctor. (Docket Item No. 43, Att. No. 1, "R. Brown Affidavit," at 1.) Policy requires that inmates being

removed from their cells for any reason be strip searched.  (R. Brown Affidavit at 1;  Docket Item No. 47, "Kilbourne Affidavit," at 2.)  This requires the inmate to remove all clothing and place it in an aluminum security box which is attached to the latch of the food tray slot on the cell door.  (R. Brown Affidavit at 1; Kilbourne Affidavit at 2.)  The security box is used to prevent inmates from throwing unknown substances on staff or assaulting them.  (Kilbourne Affidavit at 2.)  The inmate's clothing is then searched for contraband or any unauthorized items before the clothes are returned to the inmate through the security box so he can get dressed.  (R. Brown Affidavit at 1-2; Kilbourne Affidavit at 2.)  Once the inmate is dressed, he is required to back up and place his hands in the food tray slot to be restrained from behind.  (R. Brown Affidavit at 2; Kilbourne Affidavit at 2.)  The cell door is then opened, leg irons are applied, and the inmate is removed from his cell.  (R. Brown Affidavit at 2; Kilbourne Affidavit at 2.)  An inmate only needs to place his hands up to his wrists through the food tray slot and into the security box when placing clothes into the box or when being restrained.  (Kilbourne Affidavit at 3.)  He does not need to place his arms into the box in order to accomplish these things.  (Kilbourne Affidavit at 3.)  However, it is a common practice for inmates to put their arms into the security box in an attempt to knock the box off of the latch holding it on to the food tray slot in order to be disruptive or to try to assault staff by throwing unknown substances such as urine or feces or sharp objects.  (R. Brown Affidavit at 2-3; Docket Item No. 43, Att. No. 2, "W. Brown Affidavit," at 2; Kilbourne Affidavit at 3.)

According to R. Brown, Springer placed all of his clothes into the security box except his boxers, in violation of procedure.  (R. Brown Affidavit at 2.)  When R. Brown told Springer to place his boxers into the security box, he became disruptive and began yelling that he did not want to go through the full strip search.

(R. Brown Affidavit at 2.) Once Springer became disruptive, Correctional Officer W. Brown went over to his cell to be of assistance to Officers Hylton and R. Brown if necessary. (R. Brown Affidavit at 2; W. Brown Affidavit at 1-2.) Springer threw his boxers into the box using an upward motion in an attempt to knock the security box off of the food tray slot. (R. Brown Affidavit at 2; W. Brown Affidavit at 2.) R. Brown quickly closed the security box and tried to hold it in place to keep it from being knocked to the floor. (R. Brown Affidavit at 2.) At that time, Springer's boxers became caught in the food tray slot. (R. Brown Affidavit at 2; W. Brown Affidavit at 2.) R. Brown secured the tray slot and notified Housing Unit Manager Kilbourne about what had occurred. (R. Brown Affidavit at 2; Kilbourne Affidavit at 2). After notifying Kilbourne of the incident, other security staff, including Sergeant Middleton, reported to the pod. (R. Brown Affidavit at 2; Kilbourne Affidavit at 2; Docket Item No. 43, Att. No. 4, "Middleton Affidavit ," at 1.) R. Brown states that he and Officer Hylton had no further involvement with Springer. (R. Brown Affidavit at 2). According to W. Brown, once R. Brown secured the food tray slot, he left Springer's cell and resumed doing what he had been doing before Springer became disruptive. (W. Brown Affidavit at 2.) W. Brown states that he walked by Springer's cell a few minutes later, and he was standing at the window of his cell door showing his arms, which were bloodied from the hands to the elbows. (W. Brown Affidavit at 2.)

R. Brown denies assaulting Springer in any way and states that he did not slam both of Springer's arms in the security box. (R. Brown Affidavit at 2.) He states that, while Springer's arms may have been caught, it was because he was being violent and trying to knock down the security box. (R. Brown Affidavit at 2.) Likewise, according to W. Brown, R. Brown did not assault Springer and did

not intentionally slam the food tray slot down on Springer's arms. (W. Brown Affidavit at 2.) He states that Springer was being disruptive and was attempting to dislodge the security box from the food tray slot, and R. Brown closed the food tray slot as a safety measure. (W. Brown Affidavit at 2.)

The defendants also have submitted an affidavit from Housing Unit Manager A. Kilbourne. Kilbourne states that he was not present at Springer's cell when the officers were preparing to remove him from his cell. (Kilbourne Affidavit at 2.) Officer R. Brown came to get him, informing him that Springer had placed his arms into the security box in an attempt to knock it off the latch of the food tray slot. (Kilbourne Affidavit at 2.) Kilbourne states that he told a correctional officer to get the video camera, and he went to Springer's cell. (Kilbourne Affidavit at 2.) When he arrived at Springer's cell, Officers R. Brown, W. Brown and Hylton were there. (Kilbourne Affidavit at 2.) Kilbourne called Sergeant Middleton to assist, and R. Brown, W. Brown and Hylton resumed their job responsibilities and had no further involvement with Springer. (Kilbourne Affidavit at 2.) Kilbourne does not recall whether Springer was dressed when he arrived at his cell, and he does not know what happened to the clothes Springer placed in the security box or whether these were the clothes Springer was wearing when he was eventually removed from his cell. (Kilbourne Affidavit at 3.) Middleton and Correctional Officer Stanley assisted in removing Springer from his cell. (Kilbourne Affidavit at 3.) A nurse who was in the pod wrapped Springer's arms in bandages, and he was taken to the medical unit by wheelchair. (Kilbourne Affidavit at 3.) Kilbourne did not accompany Springer to the medical unit. (Kilbourne Affidavit at 3.)

The defendants also have provided the affidavit of Sergeant J. Middleton to the court in support of their Motion for Summary Judgment. (Docket Item No. 43,

Att. No. 4, "Middleton Affidavit").  Middleton states that on the afternoon of December 6, 2011, Unit Manager Kilbourne called him to Springer's pod to take Springer to the medical unit for assessment.  (Middleton Affidavit at 1.)  When he arrived at Springer's cell and saw that he had covered his cell window, he knocked on the cell door and told Springer to remove the covering.  (Middleton Affidavit at 1-2.)  Springer complied, and Middleton saw through the window that both of Springer's arms were covered in blood.  (Middleton Affidavit at 2.)  Middleton does not recall whether Springer was dressed when he arrived at his cell door.  (Middleton Affidavit at 2.)  Middleton also does not recall telling Springer to use a sheet or towel to wipe the blood from his arms, nor does he remember bringing Springer clean clothing in a laundry bag.  (Middleton Affidavit at 2.)  Middleton does not know what happened to the clothes Springer had passed through the tray slot into the security box during the strip search.  (Middleton Affidavit at 2.)  He also does not know whether those exact clothes were returned to Springer or if he put on other clothes he had in his cell.  (Middleton Affidavit at 2.)  Middleton noted on his report that the wounds on Springer's arms appeared to have been made bigger.  (Middleton Affidavit at 2.)  Middleton saw on Springer's right forearm what looked like several cuts to remove flesh.  (Middleton Affidavit at 2.)

Middleton states that Correctional Officer Rose began videotaping what was happening in Springer's cell, and that Springer was ordered to back up to the tray slot where he and Officer Stanley handcuffed him from behind before the door was opened and Springer was secured in leg irons.  (Middleton Affidavit at 2.)  Springer was dressed when he was removed from his cell, but Middleton does not know when he got dressed.  (Middleton Affidavit at 2.)  Nurse Deel was in the pod at that time and wrapped bandages around Springer's arms before he and Officer Stanley transported Springer to the medical unit by wheelchair.  (Middleton

Affidavit at 2.)  Upon arrival at the medical unit, Nurse Yates and Dr. McBride rendered further medical treatment to Springer, during which time Middleton was relieved by Sergeant Adams.  (Middleton Affidavit at 2.)

The defendants also have submitted the affidavit of Warden R. Mathena in support of their Motion for Summary Judgment.  (Docket Item No. 43, Att. No. 5, "Mathena Affidavit.")  Mathena states that an Incident Report was completed on December 6, 2011, stating that Springer attempted to throw his boxers into the tray slot and his arm on the tray slot latch.  (Mathena Affidavit at 2.)  According to the Incident Report, Springer then jerked his arm back into the cell and began screaming that the officers had attempted to shut the tray slot on his arm. (Mathena Affidavit at 2.)  The Incident Report indicates that Springer was then taken by wheelchair to the medical unit and received medical treatment.  (Mathena Affidavit at 2.)

The defendants also have submitted the affidavit of J. McQueen, a Sergeant and Institutional Investigator at ROSP, in support of their Motion for Summary Judgment.  (Docket Item No. 43, Att. No. 6, "McQueen Affidavit.")  Like Mathena, he also states that an Incident Report was prepared on December 6, 2011, regarding the alleged assault by correctional officers on Springer when they attempted to shut the food tray slot on his arms, thereby injuring him.  (McQueen Affidavit at 2.)  McQueen responded to an Informal Complaint prepared by Springer on December 9, 2011, alleging Officer Brown[5] assaulted him on December 6, 2011.  McQueen stated that he had investigated the matter, but there was no evidence to support Springer's allegations that staff assaulted him.

---

[5] Springer does not specify whether he is referring to R. Brown or W. Brown in this Informal Complaint.

(McQueen Affidavit at 2.)  McQueen also noted that the injuries Springer sustained were a result of his own actions and not those of staff.  (McQueen Affidavit at 2.)

When conducting an institutional investigation, McQueen reviews all incident reports, available video footage and any other evidence.  (McQueen Affidavit at 2.)  If he finds discrepancies, he advises the Warden of the need for further investigation, but if he finds that the matter is unfounded, that is the end of the investigation.  (McQueen Affidavit at 2.)  McQueen found that there was no evidence or information to suggest that officers assaulted Springer on December 6, 2011, and Springer's allegations were deemed unfounded.  (McQueen Affidavit at 2.)  Springer wrote another Informal Complaint on January 2, 2012, complaining that McQueen had failed to provide him the rapid eye movement and the handheld video recordings.  (McQueen Affidavit at 2.)  McQueen responded on January 19, 2012, advising Springer that information concerning any video recording system is not provided to an offender unless ordered by the courts.  (McQueen Affidavit at 2-3.)

The defendants have submitted the affidavit of V. Phipps, a registered nurse and the head nurse at ROSP, in support of their Motion for Summary Judgment.  (Docket Item No. 43, Att. No. 7, "Phipps Affidavit.")  Phipps's testimony is based on a review of Springer's relevant medical records.  (Phipps Affidavit at 1.)  Dr. McBride noted that at 2:10 p.m. on December 6, 2011, Springer had a medical assessment scheduled, but that he became disruptive and tried to knock the box off the door when security arrived to take him to the appointment.  (Phipps Affidavit at 1.)  At 3:10 p.m. on December 6, 2011, Springer was brought to the medical unit with bloody bandages to both forearms, denying that his wounds were self-inflicted.  (Phipps Affidavit at 2.)  Springer told Dr. McBride that the security

officers tried to close his arms in the tray slot at 2:10 p.m. while attempting to pull him out for sick call. (Phipps Affidavit at 2.) Dr. McBride noted multiple superficial abrasions/lacerations on both forearms and a 4 cm deep/gaping laceration on the right forearm. (Phipps Affidavit at 2.) Nurse Yates cleaned Springer's arms, and the deep laceration was prepped and numbed to receive stitches. (Phipps Affidavit at 2.) Dr. McBride placed seven stitches to close the deep laceration without difficulty, and minimal bleeding was encountered. (Phipps Affidavit at 2.) Nurse Yates cleaned and dressed the other lacerations. (Phipps Affidavit at 2.) Springer was given an antibiotic, Motrin and non-stick dressings to wear for five days, and he was advised that the stitches were to be removed in 10 days. (Phipps Affidavit at 2.) After five days, the lacerations were to be left open to air. (Phipps Affidavit at 2.)

Springer's medical chart reveals that when medical was called to his cell at 10:00 p.m. on December 6, 2011, all of the dressings had been removed except for those covering the stitched area. (Phipps Affidavit at 2.) Springer's arms were redressed, and he was advised to keep them dressed. (Phipps Affidavit at 2.) He verbalized his understanding. (Phipps Affidavit at 2.) The Medication Administration Record for December 2011 shows that Springer's non-stick dressings were changed twice a day for five days and that the stitches were removed on December 18, 2011. (Phipps Affidavit at 2.) Subsequent to the removal of his stitches, Springer was seen by medical staff for a variety of complaints including chest pain, ear wax and lower back pain. (Phipps Affidavit at 3.) However, subsequent to the removal of the stitches on December 18, 2011, Springer voiced no additional complaints regarding the injuries to his forearms. (Phipps Affidavit at 3.)

Springer submitted an Informal Complaint dated January 11, 2012, complaining that Warden Mathena instructed the doctor not to send him to the hospital on December 6, 2011, due to budget cuts and also directed that Springer was not to be housed in the medical unit for observation. (Phipps Affidavit at 2-3.) Phipps responded to Springer's Informal Complaint on January 19, 2012, advising him that because the doctor was in the medical unit to suture his wound, there was no need to send him offsite for treatment. (Phipps Affidavit at 3.)

The defendants also have produced the hand held video recording of events that occurred on December 6, 2011, beginning at some time after Middleton arrived at Springer's cell, continuing all the way through his treatment at the medical unit and his eventual return to the housing unit. The actual incident involving the security box was not captured on the hand held video camera, and the defendants, in a prior response to the court's order to compel dated October 30, 2012, stated that there is no rapid eye movement camera video footage available of Springer's cell, B-507, on December 6, 2011. (Docket Item No. 79). The video recording is not time stamped, and the officer operating the video camera states that it begins at 2:49 p.m. The video evidence may be summarized as follows. The officer operating the video camera states that at approximately 2:30 p.m., when Springer placed his boxers into the security box, he struck his arm on the tray slot and started yelling that the officers had closed his arm in the tray slot. Springer can be seen showing his bloody arms through his cell window. The officer states that Springer's arms were not previously in that condition, and that his wounds had been worsened. The officer states that Springer will be taken to the medical unit. Springer is then restrained and removed from his cell without incident. Once removed, his arms are immediately wrapped by Nurse Deel in front of the pod office where Dr. McBride is sitting. One of the two officers restraining

Springer requests a wheelchair at approximately the 4:35 minute mark of the video recording. One of the officers checks on the status of the wheelchair approximately two minutes later. The officers allow Springer to sit at a table while they wait on the wheelchair to arrive. At approximately the 8:00 mark in the video recording, one of the officers appears to ask Springer if he is alright, and he responds that he is. At approximately the 11:35 minute mark, one of the officers restraining Springer again checks on the status of the wheelchair. At approximately the 14:12 minute mark in the video recording, the wheelchair arrives, and Springer is taken to the medical unit.

At approximately the 17:55 minute mark in the video recording, Springer arrives in the medical unit. He claims that Officer Brown assaulted him with the tray slot. When a QMHP asks Springer whether he tried to hurt himself, Springer vehemently denies this, stating that he does not feel suicidal. Nurse Yates removes the bandages from Springer's arms and cleans them. The camera is stopped to take still photographs of Springer's injuries. Before stopping the video recording, the officer operating the video camera states that it is 3:17 p.m. When the video recording is resumed, the officer states that it is 3:18 p.m. and that nothing transpired during the one minute that the video camera was not recording. At this point, Dr. McBride already is in the room. Dr. McBride evaluates Springer's injuries. Approximately 1:48 minutes after the video recording resumes, Dr. McBride leaves the room, stating that he is going to get some things to stitch one area on Springer's arm, to which Springer agrees. Springer's arm is prepped for stitches. Nurse Yates works on Springer's other wounds, and Dr. McBride numbs the area to be stitched. One of the officers asks Dr. McBride if he wants to keep Springer in the medical unit overnight or send him back to the housing unit. Dr. McBride asks Springer if he was trying to hurt himself. Springer says he was not,

so Dr. McBride states that Springer may be returned to the housing unit.  Dr. McBride advises Springer that the stitches will need to be removed in 10 days.  At this point, another QMHP questions Springer about cutting himself, which he again denies, stating that he is ok.  He again states that Officer Brown closed the box on him.  At approximately the 33:40 minute mark after the recording was resumed, the camera is again turned off for approximately one minute, according to the officer operating the camera, to change the battery.  When recording is once again resumed, Nurse Yates continues to render treatment, and she administers a tetanus shot.  Approximately 10:45 minutes after resumption of recording, Springer is taken back to the housing unit by wheelchair.  At approximately 21:16 minutes after the video resumed recording after the battery change, Springer's handcuffs are removed, and he is placed in a cell.

## II. Analysis

At the outset, the court notes that to the extent Springer sues the defendants under § 1983 in their official capacities for monetary damages, I find that such suits are not cognizable under § 1983. *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 70-71 (1989) (holding that state officials sued in their official capacities are not "persons" within the meaning of § 1983). Thus, I recommend that the court dismiss such claims.

With regard to a motion for summary judgment, the standard for review is well-settled. The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a);  *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23

(1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. In order to be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore*, *Ky.,* 93 F.3d 230, 233 (6th Cir. 1996).

Springer alleges that Correctional Officers R. Brown and W. Brown used excessive force against him in violation of the Eighth Amendment's prohibition against the infliction of cruel and unusual punishment. U.S. CONST. amend. VIII. This amendment not only prohibits excessive sentences, but it also protects inmates from inhumane treatment and conditions while imprisoned. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). The unnecessary and wanton infliction of pain by a prison official through the use of excessive force upon an inmate has been clearly established as a violation of the Eighth Amendment's prohibition on cruel and unusual punishment for a number of years. *See Hudson v. McMillian*, 503 U.S. 1, 5 (1992); *Whitley v. Albers*, 475 U.S. 312, 319 (1986). The Eighth Amendment also requires prison officials to take reasonable measures to guarantee the safety of inmates. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984).

The determination of whether the use of force by a prison official violates the Eighth Amendment includes both a subjective and objective component. *See Williams*, 77 F.3d at 761 (citing *Wilson v. Seiter*, 501 U.S. 294, 302 (1991)). Not every malevolent touch by a prison guard amounts to a deprivation of constitutional rights. *See Hudson*, 503 U.S. at 9 (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). To meet the objective component in an excessive force case, an inmate must show that the force used was "nontrivial," *Wilkins v. Gaddy*, 130 S. Ct. 1175, 1179 (2010), given that "contemporary standards of decency always are violated … whether or not significant injury is evident." *Hudson*, 503 U.S. at 9. "This is not to say that the 'absence of serious injury' is irrelevant to the Eighth Amendment inquiry." *Wilkins*, 130 S. Ct. at 1178. In fact, the extent of the injury may suggest that "'the use of force could plausibly have been thought necessary' in a particular situation" or "provide some indication of the amount of force applied." *Wilkins*, 130 S. Ct. at 1178 (quoting *Hudson*, 503 U.S. at 7.) For example, "[a]n inmate who complains of a [mere] 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins*, 130 S. Ct. at 1178 (quoting *Hudson*, 503 U.S. at 9.) As *Wilkins* clarified, it is the nature of the force "that ultimately counts" and provides the "core judicial inquiry" in an excessive force case. 130 S. Ct. at 1178. In particular, courts must consider "whether [the force] was nontrivial and 'was applied … maliciously and sadistically to cause harm.'" *Wilkins*, 130 S. Ct. at 1179 (quoting *Hudson*, 503 U.S. at 7.)[6]

---

[6] *Wilkins* abrogated the Fourth Circuit's decision in *Norman v. Taylor*, 25 F.3d 1259, 1263 (4th Cir. 1994) (en banc), which held that "absent the most extraordinary circumstances, a plaintiff cannot prevail on an Eighth Amendment excessive force claim if his injury is *de minimis*." The *Wilkins* Court held that "[t]he Fourth Circuit's strained reading of [*Hudson v. McMillian* was] not defensible" and that *Hudson* "did not, as the Fourth Circuit would have it, merely serve to lower the injury threshold for excessive force claims from 'significant' to 'non-de minimis' – whatever those ill-defined terms might mean." 130 S. Ct. at 1179.

To meet the subjective component in an excessive force case, the inmate must show that the prison official applied force "maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320-21. The inquiry under the subjective standard is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7. The Supreme Court in *Whitley* set out several factors which should be considered in determining whether prison officials acted maliciously and sadistically. In particular, the court should consider:

1)    the need for application of force;
2)    the relationship between that need and the amount of force used;
3)    the threat "reasonably perceived by the responsible officials;" and
4)    "any efforts made to temper the severity of a forceful response."

*Williams*, 77 F.3d at 762 (citing *Whitley*, 475 U.S. at 321.)


Regarding Springer's excessive force claim, the evidence before the court presents a dispute in material fact that prevents the entry of summary judgment on the defendants' behalf. Simply put, if the evidence is viewed in the light most favorable to Springer, Springer's arms were slammed in the security box and held there by R. Brown and W. Brown after Springer simply forgot to place his shoes into the box during a routine strip search, resulting in wounds to both arms, one of which required seven stitches and multiple others requiring dermal bond. Thus, a reasonable jury could find that this force was not "nontrivial," that it caused serious injury and that it was not applied in a good faith effort to maintain or restore discipline, but rather maliciously and sadistically for the purpose of causing harm. *See e.g. Wilkins*, 130 S. Ct. 1175; *Wilson*, 501 U.S. 294. Therefore, I find that a genuine issue of material fact exists preventing the entry of summary

judgment on the defendants' behalf on Springer's excessive force claim, and I recommend that the court find the same.

The Defendants also argue that they are entitled to summary judgment on Springer's claims against them for denial of emergency medical care in violation of the Eighth Amendment. In order to state a claim for a violation of the Eighth Amendment right to be free from cruel and unusual punishment based on medical care, an inmate must show deliberate indifference to a prisoner's serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). In order to show deliberate indifference, a public official must have been personally aware of facts indicating a substantial risk of serious harm, and the official must have actually recognized the existence of such a risk. *See Farmer*, 511 U.S. at 837; *see also Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)) ("[T]he evidence must show that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'"). Mere negligence in rendering medical care to a prisoner, however, does not rise to the level of a claim cognizable under § 1983. *See Goode v. Hartman*, 388 F. Supp. 541, 542 (E.D. Va. 1975); *Bishop v. Cox*, 320 F. Supp. 1031, 1032 (W.D. Va. 1970). "'Allegations of improper or insufficient medical treatment do not state a Constitutional claim.'" *Bishop*, 320 F. Supp. at 1032 (quoting *Hopkins v. County of Cook*, 305 F. Supp. 1011, 1012 (N.D. Ill. 1969)). In order to establish a constitutional deprivation cognizable pursuant to § 1983, the treatment complained of must suggest "conduct that shocks the conscience." *Rochin v. California*, 342 U.S. 165, 172 (1952). Furthermore, to bring a medical treatment claim against nonmedical personnel, an inmate must show that such officers were personally involved in a denial of treatment, deliberately interfered with prison doctors' treatment or tacitly authorized or were indifferent to the prison physicians'

misconduct. *See Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990) (overruled on other grounds).

Springer alleges that R. Brown and W. Brown were deliberately indifferent to his serious medical needs because they simply left the pod, failing to summon any medical assistance for him. He alleges that Kilbourne was deliberately indifferent to his serious medical needs because when he arrived at his cell, Kilbourne insisted Springer tell him what happened before he would allow Springer to receive any medical attention. Springer further alleges that when he covered his window with paper, Kilbourne informed him he intended to send staff to extract him from his cell, and he then left the pod. With regard to Sergeant Middleton, Springer argues that he was deliberately indifferent to his serious medical needs because when he arrived at his cell, he should have notified medical personnel when he saw the severity of Springer's wounds. Instead, Springer argues that Middleton was more concerned about covering up the incident by disposing of the bloody boxers by obtaining another security box, by requesting that Springer use sheets or towels to wipe the blood from his arms and then covering the wounds before being evaluated by a nurse or doctor and by attempting to manipulate him into believing the use of a hand held video camera was not necessary until they reached the medical unit. Thus, Springer's arguments with respect to these four defendants arise from events that occurred prior to him reaching the medical unit.

There is no dispute in the evidence that once Springer was dressed and removed from his cell, he received initial first aid-type treatment from Nurse Deel in the pod. (Complaint at 7.) The housing unit pods are not equipped with the medical equipment necessary to render medical treatment beyond first aid or initial

emergency response to an inmate. (Kilbourne Affidavit at 3.) As stated above, there is no video recording of the actual incident. Thus, it is not possible to determine exactly how long Springer remained in his cell after the incident before receiving this initial first aid treatment. However, there is hand held video recorded footage of the events following the incident at issue, beginning before Springer was removed from his cell and continuing through his receipt of medical treatment and eventual return to the housing unit. This video footage is not time stamped, but the officer operating the video camera states that it begins at 2:49 p.m. on December 6, 2011. This officer further states that, according to officers present at the time, the incident at issue occurred at approximately 2:30 p.m. Even by his own account, Springer has stated that the incident occurred at 2:10 p.m., and his medical records reflect that he arrived at the medical unit for further treatment by Dr. McBride and Nurse Yates by 3:10 p.m. (Phipps Affidavit at 2.) Therefore, only one hour, at most, had elapsed from the time of the incident to the time he arrived at the medical unit, at which time his wounds already had been bandaged by a nurse. The video recording clearly shows someone, presumably Nurse Deel, placing bandages on both of Springer's arms almost immediately upon his removal from his cell by Officer Stanley and Middleton. Once Springer's arms are bandaged, one of the officers requests a wheelchair to transport Springer to the medical unit. Approximately two minutes later, one of the officers checks on the status of the wheelchair. The officers allow Springer to sit at a table to wait on the wheelchair. Approximately eight minutes after the video recording begins, it appears that one of the officers asks Springer if he is ok, to which Springer says that he is. Approximately three minutes later, one of the officers again checks on the wheelchair. Less than two minutes later, the wheelchair arrives, and Springer is taken to the medical unit. Thus, Springer's arms are immediately bandaged once

he is removed from his cell, and he is taken to the medical unit by wheelchair without any apparent undue delay by Officer Stanley and Middleton.

As stated above, to bring a medical treatment claim against nonmedical personnel, such as these defendants, an inmate must show that such officers were personally involved in a denial of treatment, deliberately interfered with prison doctors' treatment or tacitly authorized or were indifferent to the physicians' misconduct. *See Miltier*, 896 F.2d at 854. Here, Springer is alleging that these defendants were personally involved in a denial of treatment. However, based on the affidavit testimony, which is corroborated by the video recorded evidence, I find that Officers R. Brown, W. Brown, Kilbourne and Middleton are entitled to summary judgment in their favor on Springer's Eighth Amendment denial of medical treatment claims. In essence, Springer argues that these defendants violated his Eighth Amendment rights by failing to notify medical personnel of his injuries, thereby denying him medical treatment for his arm injuries for prolonged periods of time. However, the undisputed evidence shows that Springer received initial first aid-type care from Nurse Deel immediately upon being removed from his cell. Then, without any undue delay, the officers had requested a wheelchair for Springer within approximately four and a half minutes of the video's beginning, and he was taken to the medical unit approximately 10 minutes thereafter, where he received further medical evaluation and treatment by Dr. McBride and Nurse Yates. Despite the video recording's lack of time stamp, even by Springer's own account, the incident occurred at 2:10 p.m, and the medical records reflect that he arrived in the medical unit at 3:10. Thus, at most, only an hour passed from the time of the incident to the time of arrival in the medical unit, at which time Springer already had received initial treatment from Nurse Deel.

That being the case, I find that a reasonable jury could not find that any of these defendants were deliberately indifferent to Springer's serious medical needs.

For all of these reasons, I find that a reasonable jury could not find that R. Brown, W. Brown, Kilbourne or Middleton denied Springer medical treatment in violation of the Eighth Amendment. That being the case, I recommend that the court enter summary judgment in these defendants' favor on Springer's Eighth Amendment medical treatment claims.

Next, Springer claims that Warden Mathena violated his Eighth Amendment rights by denying him medical care in three distinct ways. First, he contends that Mathena denied him treatment at an emergency room at the local hospital in contravention of Dr. McBride's and Nurse Yates's professional medical judgment. More specifically, he contends that as soon as Nurse Yates removed the bandages from his arms, she informed him that he needed to be transferred to the hospital for stitches. He also claims that Dr. McBride determined that he needed to be transported to the emergency room at the local hospital, but after speaking with Warden Mathena, Dr. McBride informed Springer that the Warden would not allow him to be transported to the hospital due to budget cuts. Nonetheless, even according to Springer, Dr. McBride told him not to worry because he would render the necessary treatment himself. (Complaint at 10.) Contrary to Springer's contention, the video evidence does not reflect that Nurse Yates informed him that he needed to be transported to the hospital for stitches. In fact, the video shows the moment when Nurse Yates removes Springer's bandages and cleans his arms, but she says nothing about needing to transport him offsite. In response to an inaudible question from Springer, Nurse Yates says that one of his wounds is "gaping" and they would have to look at it and see what would have to be done.

The video also does not show Dr. McBride informing Springer that he needed to be transported to the hospital for treatment, nor does it show Warden Mathena summonsing Dr. McBride or Dr. McBride informing Springer that Mathena would not allow him to be transported due to budget cuts. Instead, the video shows Dr. McBride evaluating Springer's wounds and stating that he needed to retrieve the necessary items to stitch one of the wounds, to which Springer agrees. However, given the break in the video recording prior to Dr. McBride entering the exam room, I will give Springer the benefit of the doubt regarding his statements concerning Mathena's communications with Dr. McBride pertaining to transportation to the hospital. Thus, based on the evidence before the court, I find that there is a dispute in fact as to whether Mathena prevented Dr. McBride from transporting Springer to the local hospital for treatment. In any event, for the reasons that follow, I find that, even assuming the truth of these allegations by Springer, Mathena is entitled to summary judgment on this claim because the undisputed evidence shows that Mathena was not deliberately indifferent to Springer's serious medical needs, and Springer was not denied adequate medical care.

The undisputed evidence shows that Springer arrived in the medical unit at 3:10 pm., at most one hour after the alleged incident, his arms were cleaned by Nurse Yates, Dr. McBride assessed his injuries, and Dr. McBride and Nurse Yates treated those injuries with stitches and dermal bond. Springer's medical chart reflects that he tolerated the procedure well with minimal bleeding. His medical records also reflect that his stitches were removed on December 18, 2011, and despite medical treatment for various other maladies subsequent to that time, Springer voiced no further complaints regarding his arm injuries.

The defendants correctly note in their brief that inmates are not entitled to unqualified access to health care. Instead, the right to medical treatment is limited to that which is medically necessary and not to "that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977). Additionally, it appears that Springer's allegations are merely that of improper or insufficient medical treatment, in that he alleges that he should have been treated at a hospital instead of the prison's medical unit. However, this court has held that such allegations do not rise to the level of a constitutional claim. *See Bishop*, 320 F. Supp. at 1032. Therefore, Springer cannot make the requisite showing of deliberate indifference. Lastly, in his affidavit, Mathena states that he is not a medical doctor and does not make decisions about an inmate's medical treatment or care. (Mathena Affidavit at 2.) Instead, he relies on the professional judgment of licensed doctors and nurses and does not substitute his own judgment for their professional opinions concerning an inmate's condition or treatment. (Mathena Affidavit at 2.) Importantly, Mathena states that he makes no determinations whether an inmate should be transported to the emergency room at the local hospital for medical treatment or be treated in the prison's medical department. (Mathena Affidavit at 2.) The health care providers evaluate the inmates' complaints and determine what treatment, if any, is necessary. (Mathena Affidavit at 2.)

All of this being said, I find that because the undisputed evidence shows that Springer received adequate medical care by Dr. McBride and Nurse Yates in the medical unit, and because Mathena was not deliberately indifferent to Springer's serious medical needs, a reasonable jury could not find that Mathena violated his Eighth Amendment right to medical treatment. Therefore, I recommend that the court enter summary judgment in his favor on this claim.

Next, Springer argues that Mathena violated his Eighth Amendment right to medical treatment by disallowing the placement of stitches in a second wound in contravention of Dr. McBride's professional medical judgment. Springer contends that Dr. McBride estimated that this second wound would require three to five stitches. However, Springer alleges that after Dr. McBride received a phone call, he again left the room to speak with Warden Mathena. Upon his return, Dr. McBride decided to close this wound with dermal bond instead, even though he was not convinced that it would remain closed. As just stated, Mathena is not a medical doctor and does not make decisions regarding the medical treatment and care of inmates. (Mathena Affidavit at 2.) Instead, the health care providers determine what treatment, if any, is necessary. (Mathena Affidavit at 2.) Additionally, even given the breaks in the video recording, it is obvious that Dr. McBride, himself, determined that Springer needed stitches in only one of his wounds. The video clearly shows Dr. McBride making an initial inspection of Springer's injuries. After doing so, Dr. McBride states that he is leaving the room to retrieve the necessary items to stitch *one* of the wounds, to which Springer agrees. There is no discussion that any other wound needs to be stitched. Also, Springer never protests the use of dermal bond on any of the other wounds, nor does he express his dissatisfaction with the use of dermal bond versus stitches on the second wound, as one would expect if Dr. McBride had initially decided to use stitches, but was overridden by Mathena. It is at this time that Dr. McBride makes a remark about budget cuts while he is placing stitches in Springer's one gaping wound. Dr. McBride jokingly says he thinks he can "squeeze one more stitch out" of the suturing material he has. Then he remarks that he's "frugal," followed by "[T]his is the state of Virginia. We're on a budget."

Therefore, unlike the hospital transport issue, I find that the break in the video recording is of no import in resolving the issue of whether Dr. McBride's decision to stitch a second wound was overridden by Warden Mathena. I find that the video recorded evidence clearly demonstrates that it was Dr. McBride's decision to stitch only one wound and utilize dermal bond versus stitches on the second wound. Additionally, the undisputed evidence shows that Springer received adequate medical treatment when Dr. McBride and/or Nurse Yates closed this second wound with dermal bond. There is no evidence that this wound did not remain closed, that it did not heal properly or that Springer had any further complaints related thereto. Finally, Springer is essentially arguing that the treatment he received to the second wound -- dermal bond versus stitches -- amounted to insufficient or improper medical care. However, such allegations do not give rise to a constitutional claim. *See Bishop*, 320 F. Supp. at 1032. Thus, Springer fails to show that Mathena was deliberately indifferent to his serious medical needs.

For all of these reasons, I find that the undisputed evidence shows that Mathena was not deliberately indifferent to Springer's serious medical needs and that he received adequate medical treatment by Dr. McBride and/or Nurse Yates regarding the treatment of this second wound. Accordingly, I find that a reasonable jury could not find that Mathena violated Springer's Eighth Amendment right to medical treatment and I, therefore, recommend that the court enter summary judgment on Mathena's behalf on this claim.

Finally, Springer argues that Mathena violated his Eighth Amendment right to medical treatment by ordering that he be returned to the housing unit in contravention of Dr. McBride's professional medical judgment that he remain

overnight in the medical unit. Mathena states in his affidavit that he did not order that Springer be returned to the housing unit instead of remaining in the medical unit to recuperate. (Mathena Affidavit at 3.) He states that he is not a health care provider and has no involvement in decisions respecting an inmate's medical care or treatment or whether he is to be housed in the medical unit. (Mathena Affidavit at 3.) In this instance, the video recording resolves any dispute in fact, despite the breaks in the recording. The video evidence clearly shows that as Dr. McBride is treating Springer's wounds, one of the correctional officers guarding Springer asks whether he will be kept in the medical unit overnight or whether he will be returned to the housing unit. Before responding, Dr. McBride asks Springer whether his injuries were a result of him trying to hurt himself. When Springer said he was not, Dr. McBride makes the determination to send Springer back to the housing unit. Also, contrary to Springer's claim, Dr. McBride does not leave the room again until he has finished stitching Springer's wound, at which time Dr. McBride already had determined that Springer could be returned to his housing unit. Thus, the break in the video for the battery change is of no consequence to the decision to keep Springer overnight in the infirmary versus returning him to the housing unit. Therefore, the video clearly demonstrates that the decision to return Springer to the housing unit following treatment was that of Dr. McBride and only Dr. McBride, influenced only by Springer's answer to Dr. McBride's questioning. Thus, I find that, given Mathena's affidavit testimony, corroborated by the video recorded evidence, no dispute in fact exists regarding whether Mathena instructed Dr. McBride to return Springer to the housing unit following treatment. Additionally, I find that Springer's claim does not rise to the level of a constitutional claim because it is merely one of improper or insufficient medical treatment. *See Bishop*, 320 F. Supp. at 1032. Therefore, Springer has failed to show that Mathena was deliberately indifferent to his serious medical needs.

For all of the above-stated reasons, I find that no reasonable jury could find that Mathena denied Springer's Eighth Amendment right to medical treatment by ordering that he be returned to the housing unit as opposed to allowing him to remain in the medical unit overnight in accordance with Dr. McBride's professional medical judgment. Accordingly, I recommend that the court enter summary judgment in Mathena's favor on this claim.

Lastly, Springer argues that J. McQueen, an Institutional Investigator at ROSP, violated his Fourteenth Amendment rights to due process by failing to investigate the alleged assault and by failing to forward Springer's complaint to Internal Affairs for further investigation. In his affidavit, McQueen states that an incident report was prepared on December 6, 2011, stating that Springer alleged that he was injured when correctional officers had attempted to shut the food tray slot on his arms. (McQueen Affidavit at 2.) When conducting an institutional investigation, McQueen reviews all incident reports, available video footage and any other evidence. (McQueen Affidavit at 2.) If he finds any discrepancies after reviewing the evidence, McQueen advises the Warden for further investigation. (McQueen Affidavit at 2.) However, if he determines that the matter is unfounded, that is the end of the investigation. (McQueen Affidavit at 2.) A copy of Springer's December 9, 2011, Informal Complaint requesting an investigation into the incident is attached to McQueen's affidavit. (Enclosure A to McQueen's Affidavit.) McQueen's response to Springer's Informal Complaint states that he had reviewed the incident, but no evidence supported Springer's allegations that he was assaulted by staff. (Enclosure A to McQueen Affidavit.) Instead, McQueen stated that the injuries Springer sustained were as a result of Springer's own actions and not by the actions of staff. (Enclosure A to McQueen Affidavit.)

Springer's allegations were deemed unfounded.   (Enclosure A to McQueen Affidavit.)

I find that the court need not reach Springer's Fourteenth Amendment due process argument because he has failed to show that he has exhausted his administrative remedies with respect to McQueen's failure to investigate the assault and with respect to McQueen's failure to forward his complaint to Internal Affairs for investigation.  The Prison Litigation Reform Act of 1996, ("PLRA"), requires a prisoner to exhaust administrative remedies.  "No action shall be brought with respect to prison conditions under section 1983 of this title … by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. A. § 1997e(a) (West 2012).  The exhaustion requirement is mandatory and applies to all inmate suits about prison life.  *See Porter v. Nussle*, 534 U.S. 516, 524 (2002).  "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules…."  *Woodford v. Ngo*, 548 U.S. 81, 90 (2006).

In support of their previous motion for summary judgment, the Healthcare Defendants, supplied the court with Operating Procedure, ("OP"), 866.1, entitled "Offender Grievance Procedure."  (Docket Item No. 66, Att. No. 2.)  Under this procedure, grievances are to be submitted within 30 calendar days from the date of the incident.  Prior to submitting a regular grievance, the inmate must demonstrate that he has made a good faith effort to informally resolve his complaint.  This may be accomplished by submitting an informal complaint form to the appropriate department head.  Under the procedure, prison staff should respond to an inmate's informal complaint within 15 calendar days.  When filing a formal grievance, an

inmate must attach documentation showing that he first attempted to resolve the issue informally.  Only one issue may be addressed per grievance form.

There are three levels of review available for regular grievances.  Level I reviews are conducted by the warden or superintendent of the facility.  A response at Level I must be made within 30 days.  Level II responses are provided by the Regional Director, Health Services Director or Chief of Operations for Classification and Records and must be made within 20 days.  For most issues, Level II is the final level of review.  For issues appealable to Level III, the Deputy Director or Director of the VDOC conducts the review.  A response to a Level III appeal must be made in 20 days.  The procedure states that expiration of the time limit without issuance of a response at any stage of the process automatically qualifies the grievance for appeal to the next level of review.

Under the procedure, any grievance that does not meet the filing requirements of OP 866.1 is returned to the inmate noting the reason for the return on the intake section of the grievance form.  An intake decision may be reviewed by sending the grievance to the Regional Ombudsman for a review.

Here, Springer submitted an Informal Complaint alleging that Correctional Officer Brown assaulted him with the tray slot on December 6, 2011.  McQueen responded to the Informal Complaint, concluding that no evidence supported Springer's allegations of assault by staff and that Springer's injuries were self-inflicted.  If Springer did not agree with this finding by McQueen, pursuant to OP 866.1, he was required to file a regular grievance contesting McQueen's investigative findings.  However, Springer has neither supplied the court with any such regular grievance, nor does he allege that he filed a regular grievance.  That

being the case, I find that Springer has failed to exhaust his administrative remedies with regard to his claim that McQueen violated his Fourteenth Amendment due process rights by failing to investigate his claim of assault by correctional officers. In his Complaint, Springer also alleges that on December 28, 2011, he requested an investigation, to which McQueen responded that he would do so, but which Springer alleges never occurred. (Complaint at 18.) However, Springer has failed to produce any evidence of this request to McQueen. That being the case, I cannot find that he has exhausted his administrative remedies with respect to that specific claim, either.

With regard to his related argument that McQueen violated his Fourteenth Amendment due process rights by failing to submit his claim to Internal Affairs for investigatory review, Springer has not supplied the court with any documentation showing that McQueen had any duty to do so, despite Springer's contention that he did have such a duty. Even more importantly, Springer has produced no evidence showing that he has filed an Informal Complaint regarding McQueen's failure to forward his complaint to Internal Affairs for further investigatory review. Thus, I find that Springer also has failed to exhaust his administrative remedies with regard to this claim as well. Therefore, I recommend that the court enter summary judgment in McQueen's favor on Springer's claims that McQueen violated his Fourteenth Amendment due process rights.

The defendants argue that they also are entitled to qualified immunity on Springer's claims. Qualified immunity "shields government officials from civil liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Trulock v. Freeh*, 275 F.3d 391, 399 (4th Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S.

800, 818 (1982)); *Short v. Smoot*, 436 F.3d 422, 426 (4th Cir. 2006) ("Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"). Qualified immunity is "immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

A claim of qualified immunity is evaluated using a three-step analysis. First, the court must determine "whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001).[7] Second, the court must "inquire whether at the time of the alleged violation [the right] was clearly established." *Collinson v. Gott*, 895 F.2d 994, 998 (4th Cir. 1990) (Phillips J., concurring). Third, the court must determine whether a "reasonable person in the official's position would have known that his conduct would violate that right." *Collinson*, 895 F.2d at 998. (Phillips J., concurring).

For the reasons already stated herein, I find that there is a genuine issue of material fact as to whether R. Brown and W. Brown used excessive force on Springer. If so, each of them should have known that their actions violated Springer's right to be free from cruel and unusual punishment. Therefore, I find summary judgment based on qualified immunity on Springer's excessive force claim inappropriate at this time, and I recommend that the court deny entry of summary judgment on behalf of these defendants on this ground. However, also for the reasons already stated herein, I find that there are no genuine issues of

---

[7] In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court held that the sequential inquiry of *Saucier* is often appropriate, but not mandatory. Instead, the Court held that the judges of the district courts and courts of appeals should be permitted to exercise their sound discretion in deciding which of the prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. *See Pearson*, 555 U.S. at 236.

material fact as to whether R. Brown, W. Brown, Kilbourne, Middleton and Mathena denied Springer medical treatment in violation of the Eighth Amendment. There being no constitutional violation, I find that all of these defendants also are entitled to qualified immunity on Springer's medical treatment claims against them, and I recommend that the court grant summary judgment on behalf of these defendants on this ground as well.

## PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. The defendants are immune from suit under § 1983 in their official capacities for monetary damages;

2. The court should enter summary judgment in the defendants' favor on Springer's claims against them for damages under § 1983 in their official capacities;

3. The evidence presents a genuine issue of material fact as to whether Correctional Officer R. Brown and Correctional Officer W. Brown used excessive force on Springer on December 6, 2011, in violation of the Eighth Amendment's prohibition against the use of cruel and unusual punishment;

4. R. Brown and W. Brown have failed to demonstrate that summary judgment in their favor is appropriate based on Springer's claim that they violated his Eighth Amendment right to be free from cruel and unusual punishment;

5. A reasonable jury could not find that R. Brown, W. Brown, Middleton, Kilbourne and Mathena violated

Springer's Eighth Amendment right to be free from cruel and unusual punishment based on a denial of medical treatment;

6. R. Brown, W. Brown, Middleton, Kilbourne and Mathena have demonstrated that summary judgment in their favor is appropriate on Springer's claims that they violated his Eighth Amendment right by denying him medical treatment;

7. R. Brown, W. Brown, Middleton, Kilbourne and Mathena are entitled to summary judgment based on qualified immunity on Springer's claims that they violated his Eighth Amendment right by denying him medical treatment;

8. A reasonable jury could not find that Springer exhausted his administrative remedies with regard to his claims that McQueen failed to investigate his allegations of assault by staff on December 6, 2011, and that McQueen failed to forward his complaint to Internal Affairs for investigatory review; and

9. McQueen has demonstrated that summary judgment in his favor is appropriate on Springer's claims that he violated his Fourteenth Amendment due process rights by failing to investigate his allegations and by failing to forward them to Internal Affairs.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court grant in part and deny in part the defendants' Motion For Summary Judgment. I recommend that only the plaintiff's claim against Correctional Officer R. Brown and Correctional Officer W. Brown based on use of excessive force remain.

**Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Samuel G. Wilson, United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

DATED: This 11th day of March, 2013.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE