# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| **LEVI SPRINGER,** ) | |
| Plaintiff ) | Civil Action No.: 7:12cv00158 |
| ) | |
| v. ) | |
| ) | **REPORT AND RECOMMENDATION** |
| **C/O BROWN #1, et al.,** ) | By: PAMELA MEADE SARGENT |
| Defendants. ) | United States Magistrate Judge |

The pro se plaintiff, Levi Springer, is an inmate at Red Onion State Prison, ("ROSP"). The plaintiff's § 1983 claim against the defendants R. Brown and W. Brown was tried before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B) on July 10, 2013. The undersigned now submits the following report and recommended disposition.

## I. Facts & Procedural History

Springer brings this civil rights action against two correctional officers, R. Brown and W. Brown,[1] seeking damages and injunctive relief under 42 U.S.C. § 1983 for cruel and unusual punishment based on the use of excessive force. Specifically, Springer claims both of his forearms were injured on December 6, 2011, when the defendants slammed the cell door tray slot cover on his arms.[2]

---

[1] Springer's Complaint names C/O Brown #1 and C/O Brown #2 as defendants. These defendants have now been identified as R. Brown and W. Brown, respectively. At trial, W. Brown testified that he no longer is employed as a correctional officer.

[2] Summary judgment has been entered in the defendants' favor on all other claims raised by Springer in this case.

At trial, Springer testified that on December 6, 2011, while housed in cell B-507 at ROSP, Correctional Officers R. Brown, W. Brown and Hylton[3] came to his cell to take him for a medical appointment. Springer said that he removed all of his clothes to be strip searched before being removed from the cell. He stated that when he placed his clothes through the tray slot into the security box that the officers had attached to the cell door he realized that he had not placed his shoes into the security box. He then went to the back of his cell to retrieve them, making R. Brown upset because he was taking additional time.

Springer testified that, when he placed his shoes into the security box, R. Brown slammed closed the tray slot door on both of his arms. He states that R. Brown and W. Brown thought it was funny, and W. Brown began helping R. Brown apply more pressure on the tray slot door by pushing the security box upward. Springer testified that R. Brown asked him, "Have you had enough yet?" Springer stated that he struggled to pull his arms free, which resulted in deep gaping wounds to his forearms. Springer stated that he suffered at least three such wounds on his right forearm and one such wound to his left forearm.

Springer stated that he attempted to pull his boxer shorts out of the security box when he freed his arms, but that the officers closed the tray slot door, trapping the boxer shorts in the slot. Springer said that as soon as he got his arms free, he noticed that he was injured because his arms were covered in blood. Springer stated that he pushed the emergency button in his cell and asked to receive medical treatment. Springer said that he also saw a counselor pass his cell, and she said she would notify someone that he needed medical attention. Springer also said that W. Brown looked into his cell and saw him bleeding, but turned and walked away.

---

[3] Correctional Officer Hylton is now deceased.

Springer testified that, eventually, he was given clothing to dress, removed from his cell and taken to the medical department for treatment. Springer stated that Nurse Yates cleaned his wounds and that Dr. McBride sutured closed one wound on the upper part of his right forearm. Springer stated that he was charged a $5.00 co-pay by ROSP for seeing Dr. McBride. Springer stated that his wounds healed without complication or any lasting physical injury. Springer did state that he has suffered a lasting psychological injury, in that he fears for his safety every time he must place his arms in the tray slot on his cell door.

R. Brown testified that on the afternoon of December 6, 2011, he and Hylton went to Springer's cell to escort Springer to the medical department. R. Brown stated that Springer was one of approximately 12 inmates they were supposed to escort to the medical department over the course of that day. R. Brown said that he told Springer to take off his clothes and place them in the security box so that he could inspect them and return them to Springer. R. Brown stated that Springer took off all of his clothes other than his boxer shorts, which he refused to remove. R. Brown stated that he told Springer that, if he did not fully comply with the order to strip, he would not be allowed to leave his cell.

R. Brown testified that Springer became argumentative and retrieved another pair of boxer shorts. Springer then threw the boxer shorts through the tray slot into the security box with an upward, hard motion of his hands in an attempt to knock the security box off of the door, according to R. Brown. R. Brown then held the security box down on the door latch to prevent Springer from knocking it off. R. Brown stated that W. Brown came over to the door of Springer's cell to offer assistance. R. Brown stated that, after Springer removed his arms from the tray slot, he closed the tray slot door and removed the security box from the door and

sat it in the floor. R. Brown specifically denied that he trapped Springer's arms when he closed the tray slot cover. R. Brown stated that there was no blood in the box or on the clothes in the box. If there had been blood present, he stated that he would have bagged the clothes up in a biohazard bag and taken the security box to medical to be cleaned and sanitized.

R. Brown stated that he then went and told Lt. Middleton that Springer had become disruptive and tried to knock the security box off of the door. He stated that, other than Middleton and Housing Unit Manager A. Kilbourne, he did not speak to anyone at ROSP concerning the incident.

R. Brown also stated that he was "pretty sure" that he wrote a disciplinary charge against Springer for attempting to knock the security box off. He stated that he does not know why Springer was never prosecuted for the charge, unless the charge was not served on Springer within 24 hours, as required by policy. R. Brown also stated that it was very common at that time for inmates to attempt to knock security boxes off of their cell doors.

W. Brown also testified at trial. W. Brown testified that he was approximately five feet away from Springer's cell on December 6, 2011, when he heard Springer yelling because he did not want to remove his boxer shorts to complete the strip search to be removed from his cell. W. Brown stated that he was located to the left of R. Brown when Springer used an upward fast motion of his arms in an attempt to knock the security box off of the door. He stated that the incident happened quickly and that R. Brown reacted by attempting to hold the security box down on the latch. W. Brown stated that, after Springer removed his arms from the tray slot, R. Brown was able to close the tray slot cover and remove

the security box from the door. W. Brown stated that he never helped R. Brown shut the tray slot cover.

W. Brown stated that when the security box was removed from the door, there was a pair of boxer shorts caught in the tray slot. W. Brown stated that there was no blood on the boxers, clothes or in the security box. W. Brown also stated that he looked at Springer after the security box was removed from the door, and there was no blood on Springer at that time. W. Brown said that he then went to another pod to find a supervisor to report Springer's disruptive behavior.

According to W. Brown, he returned to Springer's cell five or more minutes later and noticed blood on Springer's arms. He then went and reported Springer's condition to Kilbourne and Middleton. He said he told them, "Springer has cut himself." W. Brown testified that he concluded that Springer had cut himself because there had been no blood on Springer a few minutes earlier, and Springer was known for disruptive, self-injurious behavior.

Housing Unit Manager A. Kilbourne also testified at trial. Kilbourne testified that he was making rounds when R. Brown came to him and told him that Springer had become disruptive during his strip search. Kilbourne stated that he instructed the officers to continue to the next prisoner to be escorted to medical on their list. Kilbourne stated that he was not present at Springer's cell during the incident. When he arrived at Springer's cell, he said that he saw that Springer was wearing boxer shorts, and his arms were bleeding. He stated that he then called other officers to take Springer to the medical department. He said that when he arrived at the cell, there was not a pair of boxer shorts caught in the tray slot.

Kilbourne testified that R. Brown advised him that Springer had attempted to knock the security box off of the door.

Kilbourne testified that ROSP is a maximum security prison. On December 6, 2011, ROSP only housed Level S offenders, he said. Level S offenders are high security offenders who have presented disciplinary problems while incarcerated.

Kilbourne stated that ROSP started using security boxes on cell doors to facilitate the safe transfer of items such as food, clothing and medication between staff and inmates. The use of the security boxes prevented inmates from throwing items such as urine or feces on staff members or grabbing staff members. Kilbourne displayed a security box, which he testified was similar to the one used on Springer's cell on December 6, 2011. The security box is made up of four sides, including a lid that opens on a hinge. One side of the box is open. Kilbourne stated that the box is hung on the tray slot cover latch with the open side against the door. The tray slot cover is then opened, allowing access into the enclosed box.

Kilbourne stated that, because the security boxes were relatively lightweight, the inmates had learned that they could knock them off of their cell doors. As a result, staff would often have to hold the security box down on the latch to prevent it from being knocked off.

James Middleton testified that on December 6, 2011, he was working as a Corrections Sergeant in the B Building at ROSP. He stated that Kilbourne called him over the radio to come to Springer's cell. When he arrived at Springer's cell, Springer had covered the window on his cell door and was yelling. Middleton stated that he instructed a corrections officer to retrieve a video camera to record

what was occurring. Middleton stated that, when Springer removed the covering from the door window, he saw Springer standing in his cell wearing boxer shorts and yelling with blood on both of his arms. Middleton stated that he instructed Springer to put his clothes on. Springer was then restrained and removed from his cell to be taken to the medical department for treatment. He said that Springer was compliant with the instructions he gave to him.

Middleton testified that Springer had numerous clear, clean cuts on each of his forearms. Middleton stated that he told someone in medical that the cuts appeared to be self-inflicted because they were clean cuts instead of jagged. Middleton stated that he did not believe that the cuts were made by Springer's arms being closed in the tray slot door. Rather, in his opinion, Springer had used a cutting device to cut himself.

According to Middleton, a security box weighs between 8-10 pounds.

John McQueen testified that he was the Institutional Investigator at ROSP. McQueen stated that he had investigated the December 6, 2011, incident involving the defendants and Springer and had found no evidence to support Springer's claim that the defendants had injured him by closing the tray slot cover on his arms. McQueen stated that he reviewed the incident reports, the rapid eye video recording taken in the pod that day and the medical records from Springer's relevant medical treatment. McQueen said that he had not preserved the rapid eye video recording because it did not show anything that would either prove or disprove Springer's claims.

Vickie Phipps, the Head Nurse and Director of Nursing at ROSP, also testified at trial. Phipps stated that she did not treat Springer on December 6, 2011, but that she had reviewed Springer's medical chart. Phipps testified that the chart contained a notation that at 2:10 p.m. on December 6, 2011, Springer had refused a medical assessment. The chart also contained a note from Dr. McBride from 4 p.m. that day stating that he had treated Springer for lacerations and scratches to both forearms. She stated that Dr. McBride had noted that Springer had suffered multiple superficial wounds to his arms and one 4-centimeter deep gaping wound to his right forearm. The note reflected that Nurse Yates cleaned Springer's wounds and that Dr. McBride applied seven sutures to close the one deep wound. Phipps testified that Dr. McBride noted "good approximation obtained." She stated that this meant that the cut was a good clean cut. She said that the medical report reflected that Springer had a "minimal" loss of blood.

Phipps stated that, based on her review of Springer's medical records, the cuts to his arms were not caused by being trapped by the tray slot door. Phipps stated that, in her opinion, the cuts were self-inflicted because they were clean cuts and not jagged. She testified that Springer was prone to self-injurious behavior. Phipps said that Springer's medical records contained numerous incidents where he had swallowed razor blades or broken eating utensils. She also stated the medical records contained incidents "too numerous to count" where Springer had cut himself. Phipps stated that Springer's medical records reflect that he previously has been diagnosed as suffering from bipolar disorder, an anxiety disorder and drug-induced psychosis. She stated that on December 6, 2011, he was being prescribed trazadone, Paxil and lithium for depression, anxiety and bipolar disorder.

Phipps testified that a Qualified Mental Health Professional, ("QMHP"), spoke to Springer after the incident on December 6, 2011. Phipps stated that the QMHP's report from that encounter noted that Springer exhibited no self-injurious behavior, no psychotic symptoms, no delusional ideations and was not disoriented or uncooperative.

The defendants also have produced the hand held video recording of the events that occurred on December 6, 2011, beginning at some time after Middleton arrived at Springer's cell, continuing all the way through his treatment at the medical unit and his eventual return to the housing unit. The actual incident involving the security box was not captured on the hand held video camera. The video recording is not time stamped, and the officer operating the video camera states that it begins at 2:49 p.m. The video evidence may be summarized as follows. The officer operating the video camera states that at approximately 2:30 p.m., when Springer placed his boxers into the security box, he struck his arm on the tray slot and started yelling that the officers had closed his arm in the tray slot. Springer can be seen showing his bloody arms through his cell window. The officer states that Springer's arms were not previously in that condition, and that his wounds had been worsened. The officer states that Springer will be taken to the medical unit.

Springer is then restrained and removed from his cell without incident. Once removed, his arms are immediately wrapped by Nurse Deel in front of the pod office where Dr. McBride is sitting. One of the two officers restraining Springer requests a wheelchair at approximately the 4:35 minute mark of the video recording. One of the officers checks on the status of the wheelchair approximately two minutes later. The officers allow Springer to sit at a table while they wait on

the wheelchair to arrive. At approximately the 8:00 mark in the video recording, one of the officers appears to ask Springer if he is alright, and he responds that he is. At approximately the 11:35 minute mark, one of the officers restraining Springer again checks on the status of the wheelchair. At approximately the 14:12 minute mark in the video recording, the wheelchair arrives, and Springer is taken to the medical unit.

At approximately the 17:55 minute mark in the video recording, Springer arrives in the medical unit. He claims that Officer Brown assaulted him with the tray slot. When a QMHP asks Springer whether he tried to hurt himself, Springer vehemently denies this, stating that he does not feel suicidal. Nurse Yates removes the bandages from Springer's arms and cleans them. The camera is stopped to take still photographs of Springer's injuries. Before stopping the video recording, the officer operating the video camera states that it is 3:17 p.m. When the video recording is resumed, the officer states that it is 3:18 p.m. and that nothing transpired during the one minute that the video camera was not recording. At this point, Dr. McBride already is in the room. Dr. McBride evaluates Springer's injuries. Approximately 1:48 minutes after the video recording resumes, Dr. McBride leaves the room, stating that he is going to get some things to stitch one area on Springer's arm, to which Springer agrees. Springer's arm is prepped for stitches. Nurse Yates works on Springer's other wounds, and Dr. McBride numbs the area to be stitched. One of the officers asks Dr. McBride if he wants to keep Springer in the medical unit overnight or send him back to the housing unit. Dr. McBride asks Springer if he was trying to hurt himself. Springer says he was not, so Dr. McBride says he should be okay in the housing unit. Dr. McBride advises Springer that the stitches will need to be removed in 10 days. At this point, another QMHP questions Springer about cutting himself, which he again denies, stating

that he is okay.  He again states that Officer Brown closed the box on him. At approximately the 33:40 minute mark after the recording was resumed, the camera is again turned off for approximately one minute, according to the officer operating the camera, to change the battery. When recording is once again resumed, Nurse Yates continues to render treatment, and she administers a tetanus shot. Approximately 10:45 minutes after resumption of recording, Springer is taken back to the housing unit by wheelchair.  At approximately 21:16 minutes after the video resumed recording after the battery change, Springer's handcuffs are removed, and he is placed in a cell.

At trial, the parties agreed that the court also should consider the documents previously submitted as evidence on summary judgment, including the various incident reports, grievance forms, medical reports and affidavits.  Included among these documents is the Internal Incident Report completed by W. Brown at 5:02 p.m. on December 6, 2011. (Docket Item No. 55-1, p. 6).  The report states that W. Brown was assisting R. Brown and Hylton pull inmates for medical appointments on December 6, 2011.  R. Brown stated that, when they instructed Springer to remove his clothes to be strip searched Springer "got mad and with a fast upward motion he attempted to knock the trayslot box off … [R. Brown] maintained contol[] of the box…."

The record also includes the Internal Incident Report completed by R. Brown at 4:30 p.m. on December 6, 2011. (Docket Item No. 55-1, p. 7.) On this report, R. Brown stated:  "Inmate Springer put all his clothes in the box except his boxers.  I … told the offender to put his boxers in the box and Inmate Springer became disruptive and threw his boxers in the shake down box in a[n] upward

-11-

motion trying to knock off the … box. I … then closed the box with the Inmate[']s boxers in the tray slot. The tray slot was secured…."

The record also includes affidavits prepared by the defendants and various witnesses. (Docket Item Nos. 43-1 to 43-7). In R. Brown's affidavit, he stated that the December 6, 2011, incident was the first time that he had had any contact or involvement with Springer. (Docket Item No. 43-1, p. 2). The affidavit also states: "I did not assault [Springer] in any way and did not slam both of his arms in the box. While his arms may have been caught, it was because he was being violent and trying to knock down the security box."

## *II. Analysis*

Springer alleges that Correctional Officers R. Brown and W. Brown used excessive force against him in violation of the Eighth Amendment's prohibition against the infliction of cruel and unusual punishment. U.S. CONST. amend. VIII. This amendment not only prohibits excessive sentences, but it also protects inmates from inhumane treatment and conditions while imprisoned. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). The unnecessary and wanton infliction of pain by a prison official through the use of excessive force upon an inmate has been clearly established as a violation of the Eighth Amendment's prohibition on cruel and unusual punishment for a number of years. *See Hudson v. McMillian*, 503 U.S. 1, 5 (1992); *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

"…[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is … whether force was applied in a good-faith effort to maintain or restore

discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7. Before the court may determine whether the defendants used "excessive" force on the plaintiff, however, the court must first find that there was a use of physical force against the plaintiff. *See Veney v. Ojeda*, 321 F. Supp. 2d 733, 744, n.17 (E.D. Va. 2004) (excessive force claim must be dismissed if no allegation defendant used force against plaintiff). "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by *the challenged application of force." Graham v. Connor*, 490 U.S. 386, 394 (1989) (emphasis added). The plaintiff in a § 1983 action bears the burden of persuasion by a preponderance of the evidence. *See Clark v. Mann*, 562 F.2d 1104, 1117 (8th Cir. 1977) (plaintiffs ordinarily retain burden of proof on § 1983 claims).

Based on the evidence presented at the trial of this matter, I find that the plaintiff has failed to prove by a preponderance of the evidence that the injuries he suffered on December 6, 2011, were caused by a use of force by the defendants. There is no doubt that the evidence presented at trial by the plaintiff, and that presented by the defendants, told two different versions of the events of December 6, 2011. At trial, Springer argued that too many inconsistencies existed in the testimony of the defense witnesses to find the defendants' version of events credible. To the contrary, however, I find that the testimony of the two defendants is very consistent with regard to the events of that day.

In particular, both defendants unequivocally testified that they did not trap the plaintiff's arms in the tray slot cover. I find particularly persuasive the testimony of W. Brown, in that he stated that he specifically recalled looking at Springer after the tray slot door was closed and that Springer was not bleeding at

that time.  W. Brown, testified that it was only after passing Springer's cell at least five minutes later that he noticed Springer was bleeding.  Further, the defendants' version of the events is supported by the evidence that Springer's wounds were clean cuts and did not appear to have been caused by the tray slot door and by the evidence that, when others arrived at his cell, Springer was still wearing boxer shorts.

Also, I note that Springer has offered no evidence that either of the defendants bore any ill will toward him.  The uncontradicted evidence before the court is that neither of the defendants worked in the B Unit containing Springer's cell.  Springer's only explanation for his alleged mistreatment is that R. Brown became angry when Springer had to retrieve his shoes to place them in the security box – an act that R. Brown admits was required before Springer could be pulled from the cell.

On the other hand, numerous witnesses testified that Springer had a history of self-injurious behavior. In particular, Nurse Phipps testified that Springer's medical records contained reports "too numerous to count" of incidents in which Springer had cut himself on previous occasions.

Based on the above-stated reasons, I find the defendants' version of the events of December 6, 2011, more credible than the plaintiff's.  Therefore, I recommend that the court enter judgment in the defendants' favor.

# PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. The plaintiff has failed to prove by a preponderance of the evidence that the injuries he suffered on December 6, 2011, were caused by a use of force by the defendants.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court enter judgment in favor of the defendants on Springer's § 1983 claim.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion

of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Samuel G. Wilson, United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

DATED: This 18th day of July, 2013.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE